JAMES GIBSON, APPELLANT, V. DANIEL LOVE, APPELLEE.

By the ancient common law the question of fraud was purely a question of fact.

The statute 13th of Elizabeth, protecting creditors and *others* from fraudulent conveyances, is to be construed liberally in favor of the class of persons designed to be protected from fraud.

A surety is the creditor of the co-obligor and, as such, entitled to all the protection which the statute 13th Elizabeth extends to creditors and others.

The statute 27th Elizabeth, though in its terms it applies only to land, yet being declaratory only of the common law, may be interpreted as defining the nature and effect of fraudulent conveyances generally.

What is termed fraud in law is distinct from fraud in fact, and it is the duty of a judge to instruct the jury that their conclusions from facts must be regulated by the character and import given to those facts by necessary legal implication. Some acts are proofs of fraudulent intent, and it is the duty of the court so to instruct the jury.

Where the legal effect of a conveyance is to delay, hinder and defraud creditors, no matter what the actual intention may have been, it is a fraud in law, and the courts are bound so to declare it.

When the seller of a slave retains possession after the sale, fraud is to be inferred, unless there is evidence not of a general character negativing a fraudulent intent, but of a character to explain possession. The presumption of fraud in a case where the vendor remains in possession, is so strong as to outweigh positive testimony of an entire absence of all fraudulent intent, or even to establish a fraud, where the jury are satisfied that there was none actually intended.

28

This case was brought up by appeal from a judgment of the Circuit Court of the County of Gadsden, given at the Spring Term, 1850. The opinion of the Court contains a full statement of the case.

*Dupont,* for Apellant.

The record shows the following state of case in the Court below : James Gibson had obtained a decree of foreclosure upon a *mortgage* of *indemnity,* executed by John C. Love, embracing amongst other things a certain slave named Henry. The decree directed the slave to be sold under direction of the master in chancery, and under this order, the master took the slave into possession. Daniel Love thereupon interposed a "*claim*" to the slave, and the issue was to try the *title* to the slave.

At the trial below, the claimant, Daniel Love, proved that he was in possession of the slave *at the date of the levy*—he also exhibited a "*bill of sale*" *absolute on its face,* from John C. Love, for the slave Henry, dated December 9th, 1841, and *recorded* January 1st, 1842. He also proved that, at the time of the alleged sale, the vendor, John C. Love, was to retain the *possession* of the slave, paying an annual *hire* for him equivalent to the *interest* of the amount stipulated in the bill of sale as the purchase money.

James Gibson, the plaintiff in execution, to support his title, exhibited a "deed of mortgage," dated on the 13th day of December, A. D., 1841, and *recorded* December 17th, 1841. He also proved that John C. Love, the mortgagor, was in *actual possession* of the slave at the date of the mortgage, and so continued for more than two years.

Upon this state of case, the plaintiff in execution prayed the Court to give to the jury certain instructions, all of which were refused, and the Court proceeded to give certain other instructions, all of which will more fully appear by reference to the "bill of exceptions" contained in the record.

To sustain the title of the plaintiff in execution, we contend as follows :

The Court erred in refusing to grant the two first instructions prayed for by the appellant. We contend that these instructions were pertinent to the facts of the case, and were asked in view of the *objects* and *policy* of the "registration laws." It is true that "recording" is not essential to the validity of a conveyance of *personal* property, and neither is it so in regard to *real* property. In reference to the latter class, however, our statute in terms makes *recording* absolutely necessary, to protect it against the claims of creditors and subsequent purchasers "without notice." Vide Thompson's Digest, 180, section 1. They also *permit* and *provide* for, and *make it obligatory* on, the recording officers to record " all transfers of *personal property*, which may be offered for record." Thompson's Digest, 183, sections 4th and 3d. It may be proper to note the distinctions observed in the statute, in regard to the two species of property, and the *reason* for that distinction, in order to lead us to a correct appreciation of the object of those statutes.

Now, it will be observed that the only effect of recording conveyances of *real property*, is to protect it against the claim of " creditors and subsequent purchasers *without notice.*" If the creditor or subsequent purchaser had *actual notice* of the conveyance, then he could claim no benefit under the statute. Why was the statute thus framed? Evidently to give notoriety to the transaction, in view of the fact that, in the transfer of title to " *real estate,*" *actual possession,* or " *possessio pedis,*" is not essential at law to pass the estate. In the transfer of " *personal* property," however, (as a general rule,) the converse of this doctrine prevails—it being well established that, to make the conveyance good against creditors and subsequent purchasers, " *possession must accompany and follow the deed.*" It would seem, however, that our Legislature, being well aware of the many exceptions and modifications to which this doctrine (as a general rule) had been subjected by the conflicting decisions of the Courts, determined to place the two

species of property upon the same footing, in regard to the " *constructive notice*," afforded by registration of the conveyance, and hence the provision in the statute for recording of conveyances of personal property. Vide Thompson's Digest, 183, sections 4th and 3d. Upon no other principle, and with no other object, can we rationally account for this provision of the statute. It certainly never could have been intended merely to subserve the *convenience* of individuals, as a means of *perpetuating* the evidence of their " title" to property, the mere *possession* of which, by operation of law, affords sufficient evidence of *title*, without the aid of any written transfer.

But why, it may be asked, does the statute in the one case declare *in terms* the conveyance *void*, as against " creditors and subsequent purchasers," and omits to do so in the other ? The reason is obvious :—In the case of the transfer of *real* property, the well established law is, that a want of *actual possession* raises no presumption of fraud ; while in the transfer of *personal* property, the law is equally well established, that, unless *actual possession* (or such as the property is capable of) accompany the deed, the presumption of fraud is always raised. The object of the Legislature, therefore, was to provide a ready mode of *rebutting* this presumption by the *notoriety of recording*, operating in the nature of a " constructive notice."

If this view of the statute law be deemed correct, then it only remains to refer to the evidence in this case, to determine the pertinency of the two instructions under consideration.

The deed of mortgage under which the appellant claims is dated December 13th, A. D., 1841, and was *recorded* on the seventeenth day of the same month. The bill of sale under which the appellee claims title is dated December 9th, A. D., 1841, but was not offered for record until January 1st, 1842 ; thus showing that, although *by its date*, it purported to have been executed four days before the date

of the mortgage, yet it was not *offered for record* until the lapse of eighteen days after making, and thirteen days after the recording, of the latter.

The evidence of Samuel B. Love (a witness) further shows that the property never in fact went into the possession of the vendee, Love, until some *two years or more* after the date of the bill of sale, and that, at the time of the execution of the mortgage to Gibson, the property was in the actual possession of the mortgagor, and so continued for two years or more. It also appears by reference to the testimony of Harris, (a witness,) that he, as a party interested in the estate of Colson, had given notice to these parties, who were co-sureties for J. C. Love, the executor, that there would probably be a deficiency on the settlement of the executor's account, and advised them to secure themselves; that upon a subsequent interview with the sureties, (both being present) a proposition was made by him (witness) to take the individual notes of the sureties for their respective portions of the liability incurred by the default of the executor, which had been then ascertained; that Love declined, and in this interview, Gibson charged him to his face with having deceived him, (Gibson,) by taking the bill of sale from his brother, (the executor,) and that he (Gibson) knew nothing of its existence until some time after the execution of the mortgage.

From this reference to the testimony, it is apparent—

1st. That no possession of the property accompanied the bill of sale to the vendee.

2d. That Gibson had no *notice* of the bill of sale at the date of the execution of the mortgage, and that the vendor was then in actual possession of the property.

3d. That the bill of sale was not offered for record until after the date of the *recording* of the mortgage.

4th. That Gibson was *deceived* by the "*dealing*" in regard to this property which took place between vendor and vendee.

In this state of case, we hold that the first two instructions prayed by appellant ought to have been given to the jury, and that it was error to refuse them.    The simple doctrine involved in these instructions is as follows, viz : " that if Gibson was *deceived* and *thereby injured,* by the want of *notice* (either actual or constructive) of the existence of the " bill of sale ;" and if this want of notice grew out of the *neglect* of vendee, or his unwarrantable *dealing* with the vendor, in regard to this property—then the bill of sale ought not to prevail against the lien of the mortgage."

But should we be in error in the view we have taken as to the " object and policy of the registration laws," and the doctrines flowing therefrom, then does this very *error* present with ten-fold force the propriety of the instruction as embraced in the third prayer.    The doctrine embraced in that prayer is the well established doctrine of the highest judicial tribunal of this country—the Supreme Court of the United States, Hamilton v. Russel, 1st Cranch, 309.    Chief Justice Marshall, in delivering the opinion of the Court, refers to the doctrine as laid down in Edwards v. Harbin, 2d Term Reports, 587, and says, " We are of the same opinion—we think that the intent of the statute is best promoted by that ·construction, and that fraudulent conveyances, which are made to secure to a debtor a beneficial interest, while his property is protected from creditors, will be most effectually prevented by declaring that an absolute bill of sale is itself a fraud, unless " possession accompany and follow the deed."    Such a deed must be considered as made with an intent to delay, hinder and defraud creditors."

1st.    This doctrine of the Supreme Court is based upon the adjudications of the English courts.    3 Coke, 80— Twine's case.    2 Term Reports, 587—Edwards v. Harben.

I am aware that the doctrine of Edwards v. Harben is said to have been *shaken* by later decisions of the English courts, but by a careful examination of these decisions it will be found, first, that in none of these cases was the doc-

trine directly involved ; and, second, that no later case has undertaken to *overrule* the doctrine.

The "possession" necessary to support an absolute bill of sale, must be *bona fide, substantial* and *exclusive.* Wordell v. Smith, 1 Campbell, 333.

A sale and immediate "*hiring*" to the vendor does not constitute such a "*change* of *possession*" as will relieve the transaction from the imputation of "*fraud in law.*" Vide 1 Smith's Leading Cases, notes to Twine's case.

An agreement that the vendor should retain possession of real estate and *pay rent* constitutes the transaction fraudulent *per se.* Vide 1 Smith's Leading Cases, 48. Cobern v. Pickering, 3 New Hampshire, 415.

2d. The doctrine, as established by the Supreme Court of the United States, has been recognized and adopted by the adjudications of the following States, viz : Virginia, Kentucky, Illinois, Indiana. Vide 1 Smith's Leading Cases, 42 to 50, where the cases may be found collected.

3d. The doctrine is recognized in the courts of South Carolina, with a distinction as to whether the "consideration" of the sale was founded on a *pre-existing* indebtedness of the vendor to the vendee—making, in such cases, the sale absolutely void by mere operation of law. Vide 1 Smith's Leading Cases, 49 to 50.

The evidence in the case at bar shows that such was the consideration of the alleged sale of the slave Henry.

4th. The doctrine as limited by the Supreme Court to bills of sale *absolute on their face*, is recognized and *extended* to mortgages and conditional sales in the following States, viz : New York, Pennsylvania, Connecticut and Vermont. Vide 1 Smith's Leading Cases, 50 to 56.

III. Having thus demonstrated the propriety of the three instructions prayed by appellant, we next proceed to enquire, first, whether the substance of these instructions is supplied by those which were given by the Court, upon the trial of the case below ; and, secondly, whether the instruc-

tions given by the Court were proper in themselves, as a correct exposition of the law applicable to the case.

1st. It is only necessary to advert to the terms of the four instructions given by the Court to perceive that they are in direct *conflict* with those prayed by appellant and refused, and consequently adverse to the position assumed under the first and second heads of this argument.

2d. The instructions given by the Court were improper in themselves, because the whole question of " fraud or no fraud" was submitted to the determination of the jury; whereas, being a "*conclusion of law*," it ought to have been decided by the Court. Vide Edwards v. Harben, 2 Term Reports, 587. Hamilton v. Russell, 1 Cranch, 309.

*Archer*, for appellee.

Gibson, at the time of the sale to D. Love, and at the time of the delivery of possession to D. Love, was not a creditor by judgment, execution or attachment — indeed, was no creditor at all within the statute of Elizabeth or of 21st James I., who could complain of want of possession in vendee or act of bankruptcy in vendor. The fact that he was surety in the executor's bond did not make him a *creditor* of his principal; otherwise he would be a specialty creditor. The bond was not a cause of action then or subsequently, but only the *occasion*, which might give rise to a future liability. Nor did the mortgage make him a creditor; for *non constat* he might never be damnified and never have a right of action.

2. Gibson gave no new credit and extended no old one while the property remained in possession of vendor. He suffered no injury whatever by the vendor remaining in possession. His liability was not increased or his security diminished by that fact. On the contrary, if J. C. Love had delivered the property to Daniel Love on the 9th December, 1841, Mr. Gibson would have been in no better condition than he is at present. This shows that in fact he sustained

no injury, and where this is the case and there is no fraud in fact in the transaction, the party complaining is without remedy. As already shown, the verdict negatives all idea of fraud in fact.

If Gibson claims under the mortgage, he must claim as a *purchaser*. But purchasers are not included within the letter or spirit of either 13th Elizabeth or 21st James. As to them *caveat emptor* applies. The bill of sale from Love to Love is good *inter partes*. By the verdict it is not tinctured with fraud in fact. The older title must prevail. A junior purchaser cannot stand above his senior, except he can cut off the remedy of his adversary by lapse of time, or bar his right by *estoppel* in deed or in *pais*. There is no lapse of time to apply in this case—no *estoppel* by deed and none in *pais*, unless the possession by vendor estops the prior vendee. But the bare fact of possession (to say nothing of the accompanying explanation in this case,) is not enough to prevent the application to Gibson of the rule *caveat emptor*. Indeed the very object of the rule *caveat emptor* is to let buyers be advised that they are not to be governed by *appearances* when they purchase personal property.

I am aware that in some cases the courts have confounded the position of a purchaser of personal property with that of a purchaser of real estate, and have held that a *bona fide* purchaser of personalty without notice of an older title may hold against the true owner. But this I maintain cannot be correct, in the absence of *actual fraud* on the part of the true owner. The statute 27th Elizabeth and our registration laws here provide for the security of innocent purchasers of real estate, and upon very correct principles. As to *loans* of personalty, we have a statute which certainly would seem to negative the positions of the appellant. In reference to personalty which passes by delivery and without writing, and which (particularly in case of slaves in this country) is often-times out of the possession of the owner, upon loan, hire, or otherwise, it would be

29

monstrous to assert that a *bona fide* purchaser from the actual possessor should hold the property against the true owner, because the *appearances* misled the last purchaser. The rule might not be so injurious in its application to ordinary chattels; but to apply it in this country, where we have personal property of such dignity and value as slaves, would make titles to property of this description so insecure as to discourage all efforts towards its acquisition.

But Gibson is not even entitled to the benefit of the position of an ordinary purchaser for value; for although technically a purchaser by virtue of the mortgage, he could not be injured by the possession remaining in vendor. He gave no credit—paid no new consideration for the mortgage. J. C. Love was not liable to him as debtor, and was under no legal obligation to give the mortgage. The act was purely voluntary, and for the *benefit* of Gibson, notwithstanding the mortgage as to "Henry" was inoperative. Gibson *complains* that, as a creditor *prospectively*, he did not get a good title *to all* the debtor's property, to the exclusion of Daniel Love and others, and forgetting the extent of his demands for security, attacks the conduct of Daniel Love, *as a fraud* upon creditors. Under the English policy, the decisions under which he invokes, Gibson's mortgage would be held to be a *fraud against all creditors*, not explainable— while Daniel Love's bill of sale, even against a judgment creditor at the time, would be capable of explanation to a jury.

Hitherto I have endeavored to show that this judgment can be affirmed, without contravening the appellant's *legal* propositions. I now maintain that these propositions are not maintainable upon principle or authority in England or America.

Chancellor Kent made great efforts to retain the stringent rule of reserving the question of fraud for the Court, and to exclude explanations to the jury; but without surrendering his prejudices, he admits his failure; and while he

compliments the Vermont Judiciary for not as yet yielding to the admitted progress of the milder rule, he adds, with proper misgivings as to the ability of that Court to hold out much longer, and with full knowledge of the unyielding demands of public policy in America, " *How long the Court will be able to stand on that ground is another question.*" See note to 2d Kent, 526.

The establishment of the stringent rule involves the ascertainment of innumerable exceptions. The exceptions are so numerous as to *disprove* the rule—for controversies in this Court which would arise under the exceptions would far exceed all the litigation which could arise under the milder principle, that each case depended upon its special circumstances of explanation.

ANDERSON, *Chief Justice,* delivered the opinion of the Court, as follows:

This is a case of a claim to personal property interposed according to the provisions of our statute of February 17th, 1833.

The facts material to the point presented to this Court are briefly these : James Gibson and Daniel Love, the parties to this suit, on the thirteenth of April, 1839, became sureties on a bond given by one John C. Love, as executor of John Colson, deceased. On the thirteenth of December, 1841, John C. Love having become indebted to the estate of his testator and some fear being entertained that he might become a defaulter, a deed of mortgage was executed by the said Love to Gibson, conveying to him several negroes and, amongst them, one by the name of Henry, the subject of the present controversy. The object of the mortgage was to save harmless the said Gibson, on account of any loss which he might sustain, as surety on the bond before mentioned. Most of the property thus mortgaged was subject to a prior lien of the Union Bank. This mortgage was duly proved by a subscribing witness, and recorded on the

seventeenth day of December, 1841, four days subsequent to its date.

On the first day of January, 1842, John C. Love acknowledged before the clerk of the Circuit Court the execution of a paper writing in these words:

"TERRITORY OF FLORIDA—GADSDEN COUNTY:

Received of Daniel Love one thousand dollars in payment for a negro-man, Henry, twenty-four years of age, a slave for life, which negro, Henry, I do warrant to the said Daniel Love, his heirs and assigns, forever, to be good property forever.

Witness my hand and seal this ninth December, 1841.

[Signed,]          JOHN C. LOVE, [SEAL.]"

On the day of its acknowledgement, (that is, January 1st, 1842,) this paper writing was recorded by the clerk. On the subsequent trial of the right of property, Samuel B. Love, a witness, stated " that about the time of making the bill of sale, John C. Love was somewhat embarrassed in his pecuniary affairs, and that he (John C. Love) was indebted to the claimant, Daniel Love, but to what amount he could not say. That about the time of making the bill of sale, he (witness) heard Daniel Love tell John C. Love, that he (John C. Love) might keep possession of the negro-man, Henry, for two or three years, if he (John C. Love) would pay him the interest on the price of the negro, Henry. That John C. Love not paying the interest, Daniel Love took possession of the negro, Henry, about January, 1843.

Another witness, Alexander Love, stated that the amount of the indebtedness of John C. Love to Daniel Love was about one thousand dollars. Another witness, Isaac R. Harris, stated that, at some subsequent time, though the date is not mentioned, " when it was ascertained that John C. Love was indebted to the estate of Colson he, (witness) and the other legatees of the estate of Colson had a meeting with Daniel Love and James Gibson, as securities of John C. Love, to see whether or not a settlement could not be

had between the legatees and the securities ; the legatees proposing to take Daniel Love's note for one-half and James Gibson's note for the other half of the amount due from John C. Love to the estate of Colson.　That Daniel Love refused to settle, unless James Gibson would let him (Daniel Love) share in the benefit of the mortgage ; which Gibson refused, saying that he (Gibson) had frequently applied to him (Daniel Love) to assist him (James Gibson) in obtaining the mortgage security from John C. Love, and that he (Daniel Love) had refused to do so."

Subsequently John C. Love became in arrears to the estate of Colson, and on the 29th of November, 1845, judgment for $2,792 82-100 was recovered against Gibson on account of his surety-ship, and that amount was paid by him in full.

On the 13th of November, 1847, a bill previously filed by Gibson, praying a foreclosure of the mortgage, was taken as confessed as to John C. Love, and on the 31st of December, 1849, the decree was made absolute, and it was ordered that the master in Chancery should take possession of the slave Henry and sell him to satisfy the claim of the complainant, Gibson.　Under this decree the master proceeded forthwith to take possession of the slave Henry, who, when levied on by him was in the possession of the claimant, Daniel Love, who thereupon, on the 4th of January, 1850, commenced proceedings for interposing his claim, by filing the affidavit required by law and executing his bond.

The case came on to be tried on the 24th of May, 1850, and after the evidence was heard the plaintiff in execution prayed the following instructions, to wit :

1st. That if the jury believe from the evidence that the property in controversy was in the possession of John C. Love at the date of the execution of the mortgage, and that the mortgage was recorded prior to the time that the property passed into the possession of Daniel Love, the claimant under the bill of sale, then the law is for the plaintiff in execution, and they will find the property subject.

2d. That if they believe that the contract between John C. Love and Daniel Love was calculated to deceive the plaintiff in execution, then the jury shall find the property subject to the execution.

3d. That when the bill of sale is absolute on the face, and the possession does not accompany the bill of sale, the contract is fraudulent *per se.*

Which instructions the Court refused to give, but gave to the jury the following, as prayed by the claimant, viz :

1st. If the jury believe that the plaintiff purchased the slave Henry, in good faith, for a valuable consideration, and arranged with the vendor that he might retain possession of the slave upon hire and, from the circumstances, that there was no fraud in fact in the transaction, the claimant is entitled to recover.

2d. That, although possession of personal property, if it continues in the possession of the vendor after a sale, is *prima facie* evidence of the transaction being colorable and fictitious, yet that such possession continuing in the vendor may be explained by the circumstances ; and if the jury believe that, under the circumstances in this case, there was no fraud in fact, then the bill of sale of the 9th December conveys a title to Daniel Love.

3d. That if the jury believe that the hiring of this slave was real and *bona fide,* and not fictitious and colorable, the possession of John C. Love was consistent with the bill of sale, being in law the possession of Daniel Love.

4th. That if the sale to Daniel Love was not fictitious or fraudulent, the possession continuing in John C. Love under an arrangement for hire cannot be complained of by a creditor, unless a new credit be given or an old one extended, under a mistaken belief that the property remained unsold.

Under these instructions the jury found the property to be in the claimant, Daniel Love, whereupon the plaintiff in execution, having by his counsel filed his bill of exceptions setting out the foregoing facts, refusal and charge, prayed an appeal to this Court.

The assignment of errors is in the following words :

1st. The Court erred in refusing to instruct the jury as prayed for by the appellant.

2d. The Court erred in instructing the jury as prayed for by the appellee.

The two sets of instructions prayed for by the respective parties are somewhat inartificially drawn up, owing, doubtless, to the haste incident to a jury trial at *nisi prius*.    No one of the instructions, taken singly, presents very distinctly the difficult questions which grow out of this class of cases; but, taken as a whole, they may be regarded as asserting on the one side that the question of fraud is a question of law, to be decided necessarily and by legal inference from certain facts ; and, on the other, that it is a question of fact, to be determined by the jury according as they may or may not believe, from the evidence, that there was an actual design to cheat.   As so intended and understood, we shall proceed to consider them.

It may tend to the better understanding of this distinction, if we remark in the outset, that, by the ancient common law, the question of fraud was purely a question of fact, involving an actual fraudulent intention, and the proper inquiry, therefore, will be, whether there is such a thing as statutory fraud, as contra-distinguished from actual fraud.

The first point to be ascertained is, the relation in which Gibson stands to John C. Love—whether he is a creditor or purchaser, or both ?

It is maintained by the counsel for the appellee, that "the fact that he was surety on the executor's bond, did not make him a creditor of his principal." Perhaps in the strict technical meaning of the term he cannot be called a creditor. But it will be recollected that the statute of 13th Elizabeth protects creditors and *others* from fraudulent conveyances, and a liberal construction of this statute in favor of the class of persons designed to be protected from fraud, has

always been admitted by the courts. "As to rights from "contracts, any one liable upon a contract, express or im- "plied, though only contingently, is a debtor from the time "the liability is entered into ; accordingly, a surety is a "creditor of the co-obligor from the time the obligation is en- "tered into ; (Howe v. Ward, 4th Greenleaf, 195;) and those "interested in an official bond are creditors of the surety "from the time that the bond is executed by him. 1st Ameri- can Leading Cases, 55. So "a guarantee is to be deemed a creditor to the guarantor, on a covenant of guaranty, even before it is broken." 8th Cowen, 407. And Gibson hav- ing made himself a debtor, on account of his liability for Love, is, by the same rule, a creditor of Love.

So, also, in Twyne's case, 3d Coke, 80, it is said, "because fraud and deceit abound in these days more than in former times, it was resolved in this case by the whole Court, that all statutes made against fraud should be liberally and beneficially expounded to suppress the fraud ;" and an in- stance is given in the case of Pauncefoot v. Blunt, where it was held that the statute embraced the case of a forfei- ture incurred to the Queen, and "it was resolved by all the barons that the statute of 13th Elizabeth, chapter 5, ex- tends to it ; for thereby it is enacted and declared that all feofments, gifts, grants, &c., to delay, hinder and defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, forfeitures, heriots, mortuaries and reliefs, shall be void, &c. *So that this act doth not extend only to creditors, but to all others who have cause of action or suit, or any penalty or forfeiture," &c.*

We must regard, then, Gibson as entitled to all the pro- tection which this statute of 13th Elizabeth designs to ex- tend to creditors and *others*, against fraudulent conveyan- ces contrived to delay, hinder or defraud them of their just and lawful actions, &c. Upon this point, also, the counsel for the appellee says : "I know of no case, where a creditor of a vendor obtaining judgment and execution after the ven-

dee got into possession, has complained of the previous want of possession in the vendee, or previous actual possession of the vendor."

The case of Edwards v. Harben, 2d Term Reports, 587, to which all the courts both in this country and in England refer as a leading case, was that of a simple contract creditor, who had obtained neither execution nor judgment before the possession of the vendee commenced; and yet the Court held in his behalf, that the sale of chattels made by the indebted vendor, under an agreement to retain possession for fourteen days, was fraudulent and, therefore, void. The counsel for appellee seems to admit that Gibson was a *purchaser*, but adds "that purchasers are not included within the letter or spirit of either 13th Elizabeth or 21st James."

A sufficient reply has been given to this objection by the authorities already quoted; but we think further, that the statute of 27th Elizabeth, though its terms apply only to land, yet being but declaratory of the common law, may be interpreted as defining the nature and effect of fraudulent conveyances generally—in its letter, re-enacting the common law as to fraud relating to land, but in its spirit, sanctioning and sustaining the condemnation passed by the common law upon all frauds. In Hudnal v. Wilder, 4th McCord, 295, it was held, "that, upon common law principles, a fraudulent conveyance of chattels might be avoided by a subsequent *bona fide* purchaser for a valuable consideration, without notice."

Gibson stands unquestionably in the relation of a purchaser, by virtue of the mortgage of 13th December, 1841. "A mortgagee is a purchaser to the extent of his interest in the premises, within the meaning of the term purchaser, as used in the statute of frauds." Ledyard v. Butler, 9th Paige, 137, and authorities quoted in the margin.]

We must, however, regard him as a subsequent purchaser; for though there is no proof on the record that the bill

of sale from John C. Love to Daniel Love was executed before the 1st of January, 1842, which was subsequent to the recording of the mortgage, yet we are concluded by the verdict of the jury to take it to have been in fact made before the date of the mortgage.

For the reasons given, we shall regard Gibson as both creditor and subsequent purchaser, entitled to the protection of the statute of 13th Elizabeth in both these relations, by virtue of the phrase " creditors and others ;" and also entitled as purchaser to the benefits of the common law provisions against fraudulent conveyances, as explained and defined in 27th Elizabeth, which was enacted in more direct reference to fraudulent conveyances of land.

In the case before us, the Court instructed the jury substantially that, unless satisfied from the facts developed by the evidence, that in the sale of the slave Henry by John C. Love to Daniel Love, there was an actual, positive design to commit a fraud, they must find for the claimant.— This instruction we consider erroneous in this—that it was not qualified, by further instructing the jury that the policy of the law, sanctioned by authority, regarded certain facts as such unerring *indicia* of fraud, that the inferential evidence afforded by them was of as high a character as direct proof. So conclusive, indeed, is the nature of this evidence in some cases, that it not only supplies the omission of direct proof of fraud, but it is so stringent in its character as not to be rebutted by direct proof of the absence of any fraudulent design. For instance, if a man largely indebted makes a voluntary conveyance of all his property, no one doubts that the conveyance is fraudulent in law, and void as to creditors, and yet it is possible that the grantor had no actual design to cheat, and the jury might so believe. It might be the grantor was in the receipt of an income from his trade, or his profession, or his business, which he deemed sufficient to enable him to pay his debts, and that, in the sanguine anticipation of the continuance of this in-

come, he calculated surely and honorably to satisfy all his creditors ; but in spite of this honest intent, however fully believed by the jury, there is no court but would instruct the jury that it was their duty to find the conveyance fraudulent. It would be fraudulent in law necessarily and independently of the actual intent of the grantor.

Though the case supposed is an extreme one, it is sufficient to show that what is termed fraud in law is distinct from fraud in fact, and that it is the duty of the judge to instruct the jury that their conclusions from facts must be regulated by the character and import given to those facts by necessary legal implication.

But we do not design to be understood as saying that generally, or even very often, does the law give to certain facts the effect of overruling and contradicting conclusions arising from other facts, as in the case supposed. It more generally gives to those certain facts a legal implication, to aid the jury in detecting the existence of an actual fraud, when its more direct and obvious manifestations may be successfully concealed. Fraud is, in its nature, secret, and the law, in its wise abhorrence of all false dealing, lends its aid to the jury through the court, to enable them to detect and expose the deception. Hence it is that it regards some acts as proofs of fraudulent intent, and it is the duty of the courts so to instruct the jury. It is not a sufficient answer to this to say, that in the case before us the judge instructed the jury, according to the second instruction asked, that the possession of personal property, if it continues in the possession of the vendor after a sale, is *prima facie* evidence of the transaction being colorable and fictitious ; but that the possession may be explained by circumstances. He should have gone on to characterize those circumstances as sufficient to explain the possession—as for instance, that the sickness of the slave Henry made his delivery impossible, or that there was something else to repel the presumption of fraud arising from the detention of the slave after the

sale. Instead of doing this, and maintaining the force and integrity of these legal presumptions, the jury are directed in the further instructions of the Judge to abandon all legal presumptions, and go into an inquiry as to fraud, as proved or not proved directly by facts.

So necessary is it to maintain the distinction between fraud in law and fraud in fact, that even in the State of New York, where the vexed questions growing out of this distinction were attempted to be settled by the enactment of a statute, declaring that " in all cases arising under the statute against fraudulent conveyances as respects creditors, the question of fraudulent intent shall be a question of fact and not of law," the courts have found it necessary still to maintain the distinction.

In the case of Cunningham v. Freeborn, 3d Paige's Reports, 557, the Chancellor said : " As this cause was heard on bill and answer only, the denial of all fraud in the execution of the assignment is conclusive evidence of the fact, in favor of the defendants, unless that allegation is inconsistent with or contradicted by some other statement or admission in the answer. But the Vice Chancellor was correct in supposing that the general denial of fraud was not sufficient, if it appeared upon the face of the assignment that its legal effect would be to delay, hinder and defraud the complainant and other creditors of the assignor. The Revised Statutes *have not made the fraud itself a question of fact in all cases, neither indeed was it possible for the Legislature to do so ;* for when a party has intentionally executed an assignment or conveyance of his property, which must hinder and defraud his creditors of their just demands, the question whether the conveyance is fraudulent or not, necessarily becomes a question of law and not of fact." See, also, 11th Wendell, 241, and 6th Hill, 433.

" So with respect to libels, where the fact of publication is incontestable, if the paper, which is the subject of indictment or information, has upon the face of it a natural and

obvious tendency to promote sedition, it is no subject of inquiry by evidence whether the party had actually such intention in his mind or not. What passes in the mind of man is not scrutable by a human tribunal—it is only to be found out by his acts. Every man of sufficient understanding is to be responsible for his actions—he is supposed to be cognizant of the law as the rule by which every man is to be governed, and, therefore, it is his business to know it. If, therefore, a man publishes what the law says is treasonable, seditious or libellous, the *intent* with which he does it is mere matter of legal inference from the fact of publication, and is not the subject of proof either one way or the other." Mr. Justice Ashurst's judgment, Rex v. Dean of St. Asaph, 3d Term Reports, 428.

In the case now before us the Court should have instructed the jury that, in the absence of positive proof of a fraudulent intent on the part of Love, they should infer it from his having retained possession of the slave after selling him absolutely, unless there was some evidence not of a general character negativing a fraudulent intent, but of a character to explain this possession which the law regards as a badge of fraud—as that the slave was too sick to be removed, or that, for the convenience of the grantee, John C. Love had kept him for a short time. The possession of the slave by the grantor for two years after the absolute sale, and for his own convenience, gives to the mere possession the force of more than mere *prima facie* evidence. So potent is the effect of presumptions of this character that, by the operation of the statute of frauds they must prevail, as we have already intimated, to establish a fraud, even where the jury are satisfied that there was no actual fraudulent intent—much more when there is a mere absence of proof of actual fraud. In the case of Salmon and Bennet, 1 Connecticut Reports, 505, the Chief Justice says "*though there be no fraudulent intent,* yet if the grantor was considerably indebted and embarrassed at the time and on the eve

" of bankruptcy, then such conveyance will be void as to
" creditors." The fraud thus established is sometimes and
appropriately called statutory fraud, and this term implies
that there may be a species of fraud, sufficient to avoid a
conveyance, distinct and different from the moral, actual
fraud into which the jury in this case were directed to in-
quire. It is the absence of all recognition of this species of
fraud, in the instructions given in this case, that makes them
erroneous.

The cases in the books which illustrate and enforce these
views are very numerous and of very high authority, but
they are so familiar to the profession that we shall refer
only to a few of them. Twyne's case, reported in 3 Coke,
80, is the most celebrated of these, and in the commentaries
on that case, in Smith's Leading Cases, by both the English
and American editors, we find all the most important au-
thorities arranged and digested, and the principles involved
very clearly and learnedly discussed. The weight of the
authorities is very decidedly in favor of the general princi-
ple that, in the sale of chattels, unless possession follows
and accompanies the deed, it is fraudulent and void as to
creditors.

In Edwards v. Harben, 2 Term Reports, 587, one Mercer
executed a bill of sale to Harben, to whom he was indebted,
of all his household furniture and effects, by way of secur-
ity for his debt, with a parol agreement that if the debt
were not paid within fourteen days, Harben might enter
upon the effects and sell them at the end of that time.—
Mercer, retaining possession, died eleven days thereafter,
and on the next day Harben took possession of the effects
and sold them. Edwards, another creditor of Mercer,
brought suit against Harben, as executor *de son tort* of Mer-
cer, and the question for the Court was, whether the defend-
ant be entitled to retain the proceeds of the effects, or whether
the bill of sale was void as against the creditors of Mercer.
It was held that Harben was liable to be sued as executor

*de son tort,* for the debts of the deceased ; for, says Justice
Buller, " Unless possession accompanies and follows the
" deed it is fraudulent and void. This case has been ar-
" gued by the defendant's counsel as being a case in which
" the want of possession is only evidence of fraud, and that
" it was not such a circumstance, *per se,* as makes the trans-
" action fraudulent in law. That is the point which we have
" considered, and we are all of opinion that if there is noth-
" ing but the  absolute conveyance without the possession,
" *that* in point of law is fraudulent."

After the English rule on this subject had been thus dis-
cussed, declared and settled, it was repeatedly held that an
absolute bill of sale of chattels, unaccompanied with pos-
session, was fraudulent at law and void  as against credi-
tors.    2 Kent, 518.

In the Supreme Court of the United States the rule laid
down in Edwards v. Harben has been approved and adopt-
ed, and it is declared that an absolute bill of sale is itself a
fraud in law, unless possession accompanies and follows the
deed.    See Hamilton v. Russell, 1 Cranch, 309.   " Modern
" decisions," says Chief Justice Marshall in that case, " have
" taken this question up upon principle, and have deter-
" mined  that  an unconditional sale, where the  possession
" does not accompany and follow the deed is, with respect to
" creditors, on the sound construction of the statute of Eliz-
" abeth, a fraud, and *should be so determined by the Court.*"
" We think that the intent of the statute is best promoted
" by that construction, and that fraudulent conveyances
" which are made to secure to a debtor a beneficial interest
" while his property is protected from creditors, will be most
" effectually prevented by declaring that an absolute bill of
" sale is itself a fraud, unless possession accompanies and
" follows the deed."

All the Federal Courts have followed the construction
here laid down by the Chief Justice.   In Virginia the same
principle has been  directly and  repeatedly adjudged  to be

well settled. Alexander v. Deneale, 2 Munford, 341. Rob-ertson v. Ewell, 3 Munford, 1. Land v. Jeffries, 5 Randolph, 211. In this latter case the real purpose and extent of the explanations allowed to be made to the jury to rebut the presumptive evidence arising from possession after an ab-solute sale, and the proper understanding of which will re-concile many apparently contradictory authorities on this point, are well defined. It was held " that when the grantor " of personal property remains in possession after an abso-" lute conveyance, the conveyance is *prima facie* fraudulent ; " but such possession is not conclusive evidence of fraud, " barring every explanation. It will lay with the purchaser " to explain and rebut the presumption of fraud—as if the " the slave be purchased and not taken away for seven " months it may be shown that he was too sick to be re-" moved." The explanation must relate to the possession. If that is unexplained, it is conclusive evidence of a frau-dulent intent.

The States of New-York, (before the revised statutes,) Kentucky, Illinois, Indiana, South Carolina, New-Hamp-shire, Pennsylvania, Connecticut and Vermont recognize the rule as laid down in Hamilton v. Russell, as to absolute bills of sale, though differing among themselves on the sub-ject of mortgages.

In New-Hampshire the distinction to which we have re-ferred as made in the case of Land v. Jeffries is fully adopt-ed. " When conveyances by one in debt are impeached, " the question is, was there a secret trust ? and in absolute " sales possession is *prima facie* evidence of it, and if unex-" plained, conclusive." Parker v. Pattee, 4 New-Hamp-shire Reports, 176.

The South Carolina cases make a distinction where the purchaser is a creditor of the grantor, as is the relation of the parties in the case before us. Adopting the rule just referred to as prevailing in New-Hampshire, in the case of an absolute sale for a price paid, it was held that " where

" a pre-existing debt is the consideration, or a part of it, re-
" tention of possession and use is conclusive and intraversa-
" ble evidence of fraud." 1 Smith's Leading Cases, 49, and
authorities referred to.

In Connecticut the true rule, as understood by this Court,
is well laid down in the case of Osborne v. Fuller, 14 Con-
necticut Reports, 530. There all the cases were reviewed,
the old principle is maintained, and the result of these de-
cisions appears to be, " that the rule is one of policy, but not
" of intention ; that it is not enough that the jury find that
" the sale was *bona fide* and for a good consideration, though
" evidence of that is proper to be submitted to the jury to
" repel actual fraud ; there must be some reason for the re-
" tention, *legally sufficient and satisfactory.* The presump-
" tion of fraud is a presumption of law, and the law judges
" of the cases in which it does not arise, and *the jury are to*
" *be instructed by the Court* as to the sufficiency and reasons
" alleged to justify the retention."

In Maryland an early statute has relieved the courts of
all difficulty upon this vexed question ; but in Massachu-
setts and Maine and Ohio and Tennessee, North Carolina
and Alabama, the courts have, to a greater or less extent,
broken down the rule as established in England and in the
Federal courts, to which we have referred. ' But this Court
can see nothing in the reasonings by which the relaxation
of the rule is attempted to be justified in the reports of those
States, to shake their conviction that the other rule is more
consonant with the objects of the statute and with the rea-
son and policy of the law.

We conclude, then, by saying that we think the Court
below, on the trial of this case, erred in instructing the jury
that the question of fraud upon which they were to pass
was a question of mere intention. / The retention of perso-
nal chattels, after a sale, is *prima facie* evidence of fraud,
and the appropriate evidence to rebut the presumption is
not the proof of the general good faith of the grantor, but

31

an explanation of the retention, to show either that it is consistent with the deed or is unavoidable, as in the case of a ship at sea, or is temporary, for the reasonable convenience of the grantee.

In reviewing the decisions of the other States we have not adverted to the diversity of opinion which exists in reference to delivery of possession of chattels which are mortgaged. We have a statute which requires all such mortgages to be recorded, and the notice thus given to the world is a negation of the fraudulent intent which the law infers from retention of possession after an absolute sale.

This case must be sent back for a new trial, and the Judge of the Circuit Court will instruct the jury according to the rule set forth in this opinion.