# CHARLESTON.

## BINDLEY *v.* MARTIN BROS.

Submitted June 21, 1886.—Decided November 6, 1886.

1. When a court excludes as evidence portions of a deposition, which has been read to the jury, it should designate clearly the parts of the deposition excluded, and if it fails to do so, and it is a matter of conjecture as to what portions of such deposition, the court intended to exclude, the Appellate Court will decide the case, as though no part of such deposition had been excluded. (p. 786.)

2. The vendor in an absolute sale of personal property continuing in possession thereof, such continued possession raises the legal presumption, that the sale was fraudulent as regards the creditors of the vendor, which presumption throws imperatively upon the vendor the whole burden of proving the fairness and good faith of the transaction; and that can not be done without sufficient

evidence, that the pretended sale was for a fair and valuable consideration, and that after the sale the vendor did not continue to have an interest in the property by some secret understanding ; and in the absence of all evidence to show, that the pretended sale was for a fair consideration, or in the absence of all evidence, from which the inference could be fairly drawn, that the vendor did not continue to have an interest in the property after the sale, the legal presumption, that he did, and that the sale was not for a valuable and fair consideration becomes absolute and conclusive ; and the same will be the legal conclusion, though some evidence was produced on these subjects, if it was insufficient to rebut this strong legal presumption, which arises from the vendors retaining possession of the property after the sale. (p. 792.)

3. If in such a case the jury find the sale to be *bona fide* and valid, the court ought not to set aside such verdict and award a new trial, unless the evidence was plainly insufficient to warrant the jury in concluding, that despite the fact, that the vendor continued in possession of the property after the sale and the strong legal presumption thence arising, that the sale was not for a fair and valuable consideration, and that the vendor retained an interest in the property after the sale, and that such sale was fraudulent and void, the consideration was fair, and no interest in the property was retained by the vendor after the sale, and it was otherwise untainted with fraud. (p. 801.)

4. The holding back of material evidence by any party to a suit raises a presumption of fact against him,¨whenever it appears, that he could have produced such evidence. (p. 805.)

*W. N. Miller* for plaintiffs in error.

*Hutchinson & Johnson* for defendants in error.

Statement of the case by GREEN, JUDGE :

The record in this case shows that Harrison Martin, David Martin and Blackburn Martin, partners trading as Martin Bros., obtained from Thomas P. Butcher, a justice of Wood county, an attachment on April 18, 1883, against the personal estate and credits of George Park found in said county and not exempt by law sufficient to satisfy the plaintiffs' claim, which was for $228.90 with interest from May 11, 1883, when the two negotiable notes, the basis of plaintiffs' claim, would become due, and the costs of this suit. The grounds for issuing this attachment as stated in the affidavit were, first, that the defendant, George Park, was a ncn-

resident of the State; second, that he had assigned or disposed of his property or a material part thereof with intent to defraud his creditors; third, that he had property or rights of action, which he fraudulently concealed. This attachment was served on the Baltimore and Ohio Railroad Company on the day it was issued, the plaintiff designating it as a debtor of said Park. On May 31, 1885, the justice rendered a judgment in favor of the plaintiffs against the defendant for $104.26 and $4.85 costs. The Baltimore and Ohio Railroad Company on July 16, 1883, answered, that it had in its hands $348.90 which the plaintiffs alleged was money due to the defendant, Parks, for lumber he sold to it; but that Albion Bindley claimed this lumber and money as belonging to him; that it did not know, to whom this money belonged; and it asked, that the parties interplead, and said, it was ready to pay this money to the person, who was entitled to receive it. Albion Bindley filed before said justice his petition alleging, that George Park as his agent furnished certain lumber belonging to the petitioner, Albion Bindley, to the Baltimore and Ohio Railroad Company early in April, 1883, amounting in value to $348.70, which sum was in the hands of said company and belonged to the petitioner and belonged to him on April 18, 1883, when this attachment was levied on this sum as a debt due from the company to Park. And the petitioner prayed, that these creditors, Martin Bros., and the debtor, George Park, be summoned before the justice to try the right of property and show cause, why the said money should not be released from the levy of this attachment and be delivered to the petitioner.

These summonses were issued at once and returned, and the justice on July 19, 1883, the parties claiming having all appeared, and the evidence and argument of counsel having been all heard, decided, that the money was not the property of the petioner, Albion Bindley, and ordered the Baltimore and Ohio Railroad Company to pay to the plaintiff, Martin Bros., out of said fund $109.95, the amount of their judgment against George Park.

The petitioner, Albion Bindley, applied promptly for an appeal from this judgment, but owing to delays caused by his living in Pittsburg, Pennsylvania, though he executed an

appeal-bond with good security and forwarded it to the Second National Bank of Parkersburg in nine days after this judgment and telegraphed to his counsel in Parkersburg, that this bond was there, yet it could not be filed before said justice till one day after the expiration of the ten days after this judgment was rendered, within which the justice could grant an appeal to such judgment. On August 2, 1883, two weeks after the judgment was rendered, Albion Bindley presented to the circuit court of Wood county his petition for appeal without *supersedeas* to this judgment, setting out these facts and tendering an appeal-bond with good security. This petition was sworn to by one of his attorneys; and the court on August 2, 1883, granted the appeal, accepted the bond and ordered, that said justice transmit at once to the clerk of the court a complete transcript of his docket and proceedings in this action and all the original papers relating thereto, which was at once done, and the case docketed in the circuit court of Wood county. On February 2, 1884, the Baltimore and Ohio Railroad Company paid on an execution issued on this judgment in favor of Martin Bros. the whole amount of the execution, and it was at once paid over to Martin Bros. On December 16, 1884, this issue between Albion Bindley and Martin Bros. and George Park was submitted for trial to a jury of six men, who heard a part of the evidence and the next day heard the remainder of the evidence and the argument of counsel thereon, and rendered a verdict for the plaintiff in the interpleader, Albion Bindley, and that of the funds in the hands of the Baltimore and Ohio Railroad Company attached, $109.95 had been paid to Martin Bros. in satisfaction of the judgment of the justice, and this said fund so attached is the property and money of Albion Bindley, and they therefore found for said appellant Albion Bindley against the said Martin Bros.; the sum of $109.95, with interest on $104.26, part thereof, from November 10, 1883, till paid. The defendants, Martin Bros., moved the court to set aside this verdict and grant them a new trial, which motion the court overruled, and reversed and annulled said judgment of said justice rendered on July 19, 1883, and rendered judgment in favor of Albion Bindley against Harrison Martin, David Martin, Blackburn Martin, partners

as Martin Bros., for $109.95, with interest on $104.26, part thereof, from November 10, 1883, till paid, and his costs about this suit as well in this court as before said justice expended.

From this judgment a writ of error and *supersedeas* was awarded by a judge of our Court.

At a trial of this cause the said defendants, Martin Bros., excepted to the rulings of the court in refusing to set aside this verdict and grant them a new trial and entering up against them said judgment on December 18, 1884. And in this bill of exceptions all the evidence before the jury is certified, which is as follows :

Albion Bindley the plaintiff offered in evidence the depositions of George Park and of himself taken in Pittsburg; and at the taking of these depositions the defendants Martin Bros., did not appear; and they were read to the jury.

George Park testified, that he had been engaged for six years in the manufacture and sale of lumber in Jefferson county, Pennsylvania and latterly in Wood and Wirt counties West Virginia. In the fall of 1882 he accepted an order from the Baltimore and Ohio Railroad Company for oak lumber to be delivered in Parkersburg. He delivered part of this lumber on this order and collected the money for the part delivered, when on March 19, 1883, he sold all his lumber on hand to Albion Bindley of Pittsburg, Pa. He sold to him the following amounts of lumber at the following prices and he furnished this statement of it:

| | | |
|---|---|---:|
| "50,000 feet 2¾x6 white oak at $12 per. M ... ........ .. $ | | 600 00 |
| 20,000 " 1 in. oak board at 12 per. M ... .......... . . . | | 240 00 |
| 5,000 " 1½ in. " plank " 12 " " . . . . . . . . . | | 60 00 |
| 5,000 " 2 in. " " " " " " ....................... | | 60 00 |
| 5,000 " 3 in. " " " " " " ................. . | | 60 00 |
| 5,000 " 4 in. " , " " " " " . . . .. . . . | | 60 00 |
| 2,500 " 3x4 " " " " " " .... .. . . . | | 30 00 |
| 60,000 " white oak for cars " " " . . .. ..... | | 720 00 |
| 64,000 " popular lumber at $10 " " ... ... . | | 640 00 |
| The above lumber was in W. Va.; 70,000 feet popular boards on wharf in Pittsburg, at $12 per. M. .. ..... | | 840 00 |
| | $ | 3,310 00" |

All this lumber was at his, Park's, mill at Claysville in Wood county, West Virginia and on Hughes river in Wirt county, West Virginia, except 70,000 feet, which was at the

wharf in Pittsburg, Pennsylvania. It was sold at the fair market value. He gave a list of the lumber to him but the sale was not in writing. He sold it because he had made arrangements to sell the land and quit the business and to provide the means of paying his hands and business debts. He had frequently before sold large lots of lumber to Albion Bindley. They were several days making this sale chaffering about the prices but finally agreed on the above prices. B. was to have immediate possession of the lumber, where it was, and Park agreed to supervise its shipment to Pittsburg. And he agreed to carry out and complete his, Park's contract with the Baltimore and Ohio Railroad Company for the oak lumber. He carried out this contract and superintended the shipment of the timber to Pittsburg, Albion Bindley paying the hands employed for that purpose and the cost of shipment. He carried out his contract to fulfil his contract with the Baltimore and Ohio Railroad Company; and all the money in the hands of the Baltimore and Ohio Railroad Company attached in this case is due for lumber so sold by Park to Bindley and delivered to said company by him as the agent of Bindley. Bindley was to pay Park for the timber he sold in six months after it should reach Pittsburg. On March 30, Park informed Bindley he would give orders in favor of his creditors and require him to pay the money coming to Park on this sale of lumber to various creditors in a certain order placing the claims against him for labor in the first class and next his indebtedness to steamboat and towboat companies and then his business creditors at Pittsburg and Parkersburg including Martin Brothers. Bindley agreed to pay the money he owed Park to his creditors in the order specified and accepted these orders. No suits were then pending or threatened against him, and the contracts, which he had made to sell his land and lumber, would have realized enough to pay all his debts and leave a considerable surplus. His debts have not been all paid, he says, because one of his creditors attached all the lumber, and another— Martin Bros.—attached the money in the hands of the Baltimore and Ohio Railroad Company. He never had received any money from Bindley except to pay for the shipment of the lumber, which he sold him, to Pittsburg, and it was ap-

plied for that purpose, and he could not get a cent for his personal use of what was due him for the sale of this lumber, till all his debts, for which he gave an order on Bindley, were paid.

In the deposition of Albion Bindley he testifies to the sale of the lumber to him by Park, just as it was stated in Park's deposition. The sale was made on March 19, 1885. He, Bindley, was to take immediate charge and possession of the lumber, where it was, but, but as he could not attend to its shipment from there to Pittsburg, where he lived and was engaged in the timber and building business, Park agreed to attend to the shipping for him, the price of the timber was to be paid six months after its arrival at wharf at Pittsburg. Park accordingly did go there and, after he had shipped a small amount of the timber, it was attached by one of his creditors. Bindley says, he paid all the expenses incurred in this shipment out of his own pocket. He agreed to fill Park's previous contract with the Baltimore and Ohio Railroad Co. for the sale and delivery of oak lumber, and he caused this lumber to be shipped to the Baltimore and Ohio Railroad Co. and presented his bill to them in his own name for $348.70, but afterwards at their request made out the bill in the name of George Park, agent for Albion Bindley. This was the money attached in this suit. All this lumber, for which this $348.70 is due, was delivered by him to the Baltimore and Ohio Railroad Co., after his purchase of it from Park. He furnishes a detailed list of the lumber and of the times of its delivery to said Company and the amounts and the price per thousand feet, which said Company was to pay for it. These shipments were all made on April 2d 1883, and on April 4, 1883, and the total value of the lumber shipped on those days to the Baltimore and Ohio Railroad Co. by him through his agent Park at the prices agreed on was $348.70. He makes the same statement as Park about the orders given by Park on him on March 3d 1883, and his acceptance of them, and says, he has paid all the money due to Park on this sale of lumber to him in accordance with these orders accepted by him, and none of it to Park individually. These depositions were taken February 20, 1884.

The only other evidence given to the jury by the plaintiff were the papers and proceedings in the attachment case as above set forth.

The defendants, Martin Bros., proved by T. P. Butcher, the justice who tried this interpleader case, that both Park and Bindley were witnesses at the trial before him, and proved, that they testified before him to just what they deposed to in their deposition in substance; but he says, "that there was a contract of sale on said trial offered in evidence by said Bindley; he did not recollect just what it contained, but from his best recollection it contained the list of lumber purchased by Bindley from Park; that also a claim against the Allegheny Railroad Co., was in it but does not know what it amounted to. He thinks there was no consideration mentioned in said paper-writing and it was proven on said trial the price, for which the timber was sold by Park to Bindley." Butcher the justice says also, "that when said paper-writing was offered in evidence, Martin Bros. objected to the same." E. A. Sherwood, the sawyer at Park's mill at Claysville, on behalf of Martin Bros., testified, that he was such sawyer there both before and after the 19th of March, 1883, and until the mill was attached by some of Park's creditors; that so far as he knew, the lumber at this mill on March 19, 1883, had not been measured by Park, and if it had been, he thinks he would have known it. He had measured and assisted in loading all the lumber sold to the Baltimore and Ohio Railroad Co.; that Park was at the mill after March 19, 1883, and ran it as before and sold various lots of lumber after that to other persons; that Bindley was never there; that Park shipped no lumber to Pittsburg after March 19, 1883, except a barge-load on the Little Kanawha river, on which he, Sherwood, had levied an attachment, which he afterwards released. Park never represented to him after March 19, 1883, until the attachment, that he had sold the lumber to Bindley nor to anybody else, so far as he knew, but he continued at the mill selling lumber as before. The other lumber at the mill was sold by the sheriff of Wood county under an attachment; he was present at the trial of this case before the justice and read what purported to be a contract for the sale of lumber from

Park to Bindley, which was offered in evidence, but does not know what it contained, but he Bindley claimed under it the money from the Baltimore and Ohio Railroad Co., and thinks the same items of lumber were in it, as mentioned in Park's deposition. Bindley afterwards told witness, that he had made the contract with Parks in good faith and was going to take an appeal in this case."

John Murphy simply testified, that he was and had been the agent of the Baltimore and Ohio Railroad Company and gave an order for lumber to Park in 1882 or 1883 and the money attached in this suit was the proceeds of this lumber; but he did not know, to whom the lumber belonged when furnished to the company, and the lumber was sold to the company in the name of Park individually and not as agent.

Bennington, who was in business with Martin Bros., testified for them, that he was present at the trial of this case before the justice " and saw a paper-writing offered in evidence, but did not know what it contained. Saw no change when he was at Claysville. Park was conducting the business there on and after March 15, 1883, as before. It was also proven, that the money attached by Martin Bros. in the hands of the Baltimore and Ohio Railroad Company and claimed by Bindley had been paid over to Martin Bros. because Bindley had got no *supersedeas*, when he took his appeal, and the amount so paid was proven. This bill of exceptions then proceeds : " And thereupon on motion of the defendants, Martin Bros., by counsel the court excluded from the jury all the evidence of the claimant Bindley and the witness, Park, relating to a contract not in writing, as testified by them." After this was done the defendants offered some portions of the proceedings before the justice, which the plaintiffs had omitted to present, and it went to the jury.

This was the case, as stated in this bill of exceptions, on which the jury founded their verdict for Bindley, which the court refused to set aside, and on which verdict the court rendered the judgment, which is now before us for review on writ of error and *supersedeas*.

Opinion by GREEN, JUDGE :

The bill of exceptions taken by Martin Bros., the defendants, to the refusal of the court to award them a new trial,

when the jury found a verdict for the plaintiff, Albion Bind-
ley, sets out all the evidence introduced and submitted to the
jury. The evidence on the part of the plaintiff consisted of
the depositions of the plaintiff and George Park and a part
of the proceedings before the justice sent up by him on the
granting of the appeal from his judgment. Among other
matters, which were testified to by these witnesses in these
depositions, a portion of it by one or the other of these wit-
nesses and a portion of it by both of them, was the following:
That Parks was in the fall of 1882 and had been for some-
time previous thereto engaged in the lumber-business saw-
ing up lumber, which he got in whole or in part on his own
land and selling this lumber. His saw-mill being located in
Wood county, West Virginia. Having made up his mind to
quit this business he made arrangements to sell his timber
land, and in the spring of 1883 he was seeking a purchaser
to take all the lumber he then had on hand, most of it being
at his saw-mill. He had frequently sold lumber before that
to Albion Bindley, the plaintiff, a lumber merchant of Pitts-
burg, Pa. He saw him and offered to sell all the lumber, he
had on hand, and named to him the prices, which he was willl
ing to take for the different sorts of lumber. B. thought the
prices too high. After chaffering for several days they bar-
gained on March 19, 1883,—they having agreed on the prices
to be paid for each kind of lumber, B. was to have imme-
diate possession of the lumber, where it was. Park was to
superintend the shipping to Pittsburg of that part of the
lumber in West Virginia, and Bindley to pay the expenses
of Park, as well as the hands employed in shipping the
lumber, and the costs of transportation; and he was
to pay for it the prices agreed upon six months after the lum-
ber arrived in Pittsburg. In the fall of 1882 Park ac-
cepted an order to furnish the Baltimore and Ohio Railroad
Company at Parkersburg a considerable quantity of oak
lumber at certain prices per thousand feet agreed upon. Part
of this lumber had been delivered by Park to the Baltimore
and Ohio Railroad Company before this sale to Bindley on
March 19th, and Park according to the contract had been
paid by the Baltimore and Ohio Railroad Company in full
for all the lumber he had delivered prior to March 19, 1883,

and Bindley agreed, when he bought all Park's lumber, to carry out and complete this contract of Park with the Baltimore and Ohio Railroad Company. It does not distinctly appear, whether this lumber had been measured, when this sale was made on March 19, 1883, or not; though from the depositions of these two witnesses the inference would be, that it had been. Park says positively in his deposition, that this sale made March 19, 1883, was not in writing; he simply gave Mr. Bindley a list of the amount and kind of lumber he had on hand, which list he furnishes in his deposition, which he says was the same he gave Bindley. And the inference to be drawn from what Bindley testifies is, that this statement by Park is correct.

The justice testified before the jury as a witness for the defendants, Martin Bros., that there was a contract of sale on the trial before him offered in evidence by Bindley, and the attorney for Martin Bros. objected to its being introduced as evidence. He said he did not recollect just what it contained, but from his best recollection "it contained the list of lumber purchased by Bindley from Park, thinks also a claim against the Allegheny Railroad Company, but does not know what it amounted to. He thought, there was no consideration mentioned in this paper-writing, and it was proven on the trial at what price the lumber was sold." He also proved, that Bindley at this trial testified, that he had appointed Park (after this purchase from him) his agent to look after this lumber and ship it to him at Pittsburg.

Sherwood, a witness for the defendants, Martin Bros., testified before the jury, that he was a sawyer for Park at his mill in Wood county both before and after March 19, 1883; that lumber at the mill had not been measured, so far as he knew and believed, prior to March 19, 1883; and that Park was at the mill after that time and ran it as before and sold various lots of lumber to other persons. He was at the trial before the justice and saw and read what purported to be a contract for the sale of lumber from Park to Bindley, which was offered in evidence, but he does not know what it contained, but Bindley claimed under it the money from the Baltimore and Ohio Railroad Company, and thinks, the same items of lumber were in it, as are mentioned in the deposition of Park.

Bennington, who was in business with Martin Bros., says, he was at the trial before the justice and saw a paper-writing offered in evidence, but he did not know what it contained; whenever he was at the mill after March 19, 1883, Park was conducting the business and acting as usual before this date.

The bill of exceptions taken by Martin Bros. to the refusal of the court to award them a new trial says: after part of this evidence was submitted a motion was made by Martin Bros. to "exclude from the jury all the evidence of the claimant Bindley and witness Park relating to a contract not in writing as testified by them." After that the defendants introduced only the balance of the transcript of the proceedings before the justice, which the plaintiff had not introduced. It is obvious therefore that the court did not intend by this to instruct the jury to disregard such portions of the evidence of Bindley and Park contained in their depositions, of which I have given the substance in the statement of the case, as they might consider related to any contract not in writing. It did not intend to give an instruction of any sort to the jury, as it was done, before the evidence was concluded, and instructions to the jury are not given, till after the evidence is closed. What the court intended was to exclude certain portions of the depositions of Park and Bindley from the consideration of the jury entirely, because it was secondary evidence, there being in the possession of Bindley a written contract, which would have shown definitely and accurately some things, which were improperly attempted to be proven by Park, and the written contract, which was the primary and best evidence on this subject, not being produced, when it could have been, by the plaintiff, neither he nor Park could properly testify in reference to those matters, which could be better proven by the production of the writing, the contract between them, which had been produced at the trial before the justice. But the court failed to designate, what portions of the depositions of Bindley and Park it excluded from the jury as evidence. The counsel of Martin Bros. argue, that there "was no material evidence before the jury, upon which to found any verdict for Bindley," because the court excluded

all the evidence of Bindley relating to a contract not in writing, and all his material evidence related to such a contract. And as the statute Acts of 1881 ch. 8 § 151 provides, that the affirmative of the issue in such a proceeding as this shall be on the claimant Bindley in this case, and the court having excluded from the jury all his material evidence, it was bound to grant a new trial, when the jury found for the plaintiff, and the defendants asked a new trial. But the refusal of the court below to grant such a new trial shows clearly, that it did not consider that it had excluded from the jury all the material evidence of the plaintiff.

From the record presented to us I am unable to arrive at any definite conclusion as to what portions of the depositions of Bindley and Park the court intended to exclude as evidence. It is impossible for me, as it must have been for the jury, to understand what portions of the depositions of Bindley and Park "related to a contract not in writing" which the court intended to exclude as evidence. If we give to this phrase, as the counsel for the plaintiff in error does, its broadest and most comprehensive meaning, it would include every material part of these depositions; and this the court certainly did not mean, or it would have excluded the depositions from the jury. There were several different contracts not in writing, to which portions of these depositions related either remotely or directly. For instance in both these depositions it is stated, that on the 30th of March, 1883, Bindley agreed with Park to pay to the creditors of Park in a certain order the money Bindley owed Park on this sale of lumber. Did the court intend to exclude all that was said about this in these depositions? It certainly "related to a contract not in writing." I can hardly suppose it did. Again both these witnesses speak of a contract between Park and the Baltimore and Ohio Railroad Company in the fall of 1882, whereby Park was to deliver certain quantities of oak lumber at certain prices to this company. Did the court intend to exclude from the jury as evidence what was said on this subject? I suppose not; and yet "it related to a contract not in writing." Then these depositions both speak of a contract between Bindley and Park, whereby Bindley agreed to carry out, as far as it was

not completed, this contract, which Park had made with the Baltimore and Ohio Railroad Company in the fall of 1882 to deliver certain oak lumber. Is what these witnesses testify in their depositions on this subject intended to be excluded as evidence from the jury? It certainly "relates to a contract not in writing as testified by them." And each of these depositions speaks of a sale of all the lumber Park had on hand on March 19, 1883, to Bindley at certain prices per thousand feet for different sorts of lumber. Was this intended to be excluded as evidence from the jury? It also "relates to a contract not in writing as testified by them."

It I were at liberty to make a guess as to the portions of the depositions, which the court below intended to exclude from the jury, I would guess, it was probably those portions that relate to the terms of the contract for the sale of this lumber made on March 19, 1883, between Bindley and Park; as, if there was any contract in writing at all, it was most probably this contract, but the proof that this contract was in writing is far from satisfactory, and even if it were, it would not be a fair inference, that the contract made by Park and Bindley at the same time on March 19, 1883, whereby Bindley agreed to complete the contract made in the fall of 1882 by Park with the Baltimore and Ohio Railroad Company for the delivery of certain quantities of oak timber at certain prices per thousand feet, was also in writing, or that, though made at the same time, they were one contract and contained in the written contract of sale, if that contract was in writing.

In *Harrison* v. *Henderson*, 1 Foster (21 N. H.) 224, it was held, that, although parties may have made a written contract, it may be shown, that at the same time they made a verbal contract touching the subject of the writing, if it do not contradict or vary it. As for example, a bill of sale for a horse may be offered in evidence containing also a receipt for the payment of the price, yet parol evidence would be admissible, that the vendor at the time of the sale warranted the horse to be sound, and such parol evidence would be admissible, as it would not contradict or vary the writing. The same is held in *Allen* v. *Pink*, 4 M. & W. 140.

But really there is no satisfactory proof, that the sale made

by Park to Bindley on March 19, 1883, was reduced to writing and signed by them. Park positively testified, that it was not in writing; and that he simply gave to Bindley a memorandum or list of the amount and kind of lumber, which he had on hand, all of which was included in the sale; and he files with his deposition a memorandnm of the amount and kind of lumber which he had on hand, and of the price per thousand verbally agreed upon, and what it all amounted to; this I have copied in the statement of this case, and we can also fairly infer, that this was the character of this contract, from Bindley's deposition. The evidence by the opposite side does not satisfactorily prove, that this particular contract was reduced to writing and signed by the parties. The justice, who tried the case, does say, that there was a contract of sale on this trial offered in evidence by Bindley. He thinks it contained a list of lumber purchased by Bindley from Park; but, he thinks, the price to be paid was not named in this paper-writing, as he calls it sometimes; and the introduction of it was objected to by Martin Bros. Now, if we consider this evidence alone, it seems quite possible, if not even probable, that the justice was speaking really not of a contract of sale signed by Bindley and by Park but of a paper-writing a mere memorandum of the different quantities and kinds of lumber sold, such as Park introduced in his deposition. If this was the character of the paper-writing, he speaks of, we can readily see, why the counsel of Martin Bros. should object to its introduction while, if it was a regular contract of sale signed by Bindley and Park, we can not see, how its introduction by Bindley as evidence could be objected to by the counsel of Martin Bros. But the fact, that the justice thinks, that the prices of this lumber were proven by parol evidence, would seem to indicate, that it could not have been a contract of sale signed by these parties. He does not pretend to say, it was signed by them. He does, it is true, once call it a contract of sale; but he afterwards speaks of it as a paper-writing, whose introduction was objected to, and in which the consideration was not named. Even if some memorandum had been signed by Park, which did not set out the obligations imposed on Bindley, and it was not signed by

him, though it might have been signed by Park, it would not necessarily have excluded the plaintiff, Bindley, from introducing proof with reference to the terms of his contract. (*Tuschute* v. *Harris*, 9 Pick. 12.). The evidence of Benning-ton that "he saw a paper-writing offered in evidence at the trial, but he did not know what it contained" would rather tend to show, that this paper-writing was some memorandum and not a contract signed by the parties. He does not use language at all appropriate to describe a written contract signed by the parties. Sherwood, another witness, does testify, "that he was at this trial and saw and read what purported to be a contract for the sale of lumber from Park to Bindley, which was offered in evidence, but he does not know what it contained, and he thinks that the same items of lumber were in it as are mentioned in Park's deposition."

The court as well as the jury might well hesitate to consider it by this evidence proven, that this contract of sale of. March 19, 1883, was in writing and signed by the parties in opposition to the positive statement of Park, that it was not, corroborated by a like inference to be drawn from Bindley's deposition. I shall therefore consider this case on its merits, as if no part of the depositions of Bindley and Park had been excluded by the court below as evidence to be considered by the jury and given the weight, it was legally entitled to receive.

If any of the facts testified to by Bindley or Park in their deposition with regard to the terms of the sale of the lumber claimed to have been made by Park to Bindley or any other facts testified to by them in their depositions could have been proved by the plaintiff by the production of superior and better and most satisfactory evidence, as for instance, a contract between them or any written memorandum, which was admissible as evidence, the holding back of such evidence raises a presumption of fact against him, if this evidence could have been produced by him. In this case for instance Bindley in his deposition says: "On March 19, 1883, Park sold me the amount and kind of lumber he has stated in his testimony and at the prices he says. I was to take immediate charge and possession of it, but as I could not attend to its shipment from there, he agreed to attend to it for me, and I

was to pay him six months. after its arrival at Pittsburg."
This is also testified to by Park in his deposition. Now the
facts here stated are of the highest importance to the plain-
tiff. They, if true, not only established the sale of Park's
lumber to Bindley a month before the attachment was issued
against Park, but they show, that the sale and change of
property in this lumber took place on March 19, 1883, and
not when the lumber arrived at the wharf at Pittsburg; and
they also furnish an explanation of the fact, that subsequently
to March 19, 1883, Park was acting as apparent owner of this
lumber in shipping it off and employing hands to assist in so
doing. Now if there had been a written contract of sale in
the possession of Bindley showing, that these were the stipu-
lations in the contract of sale, it would be natural for him to
have resorted to this high character of evidence to prove
these facts so important for him to prove, and if he had in
his possession this higher and more satisfactory evidence
and withheld it and chose to rely on the parol evidence of
himself and of Park, the jury would have a right to re-
gard this evidence with *suspicion*, and it ought to require
much less evidence to overthrow it, than would have been
required, had the plaintiff had no higher or more satisfac-
tory evidence, which he could have produced.

Now we have seen in this case, that the attempt on the
part of the defendants, Martin Bros., to prove, that the plain-
tiff had in his possession and produced at the trial this
higher and more satisfactory evidence, was as to the terms of
this sale though not a total failure at least very unsatisfac-
tory; and therefore, if the jury inferred, that the plaintiff
Bindley did not have this more satisfactory evidence in his
possession, we can not say, that the inference, which they
drew, was so unreasonable as to justify this Court in setting
aside their verdict in favor of the plaintiff. The unfavora-
ble inference to be drawn against a party, who holds back
evidence of importance, which he could produce, is illus-
trated by the following among other cases: *Fowler* v. *Ser-*
*geant*, 1 Grant 355; *Wentworth* v. *Floyd*, 10 H. L. Cas. 589;
*Finch* v. *Barbour*, 24 Pa. St. 120. But in such case it should
be understood, that the presumption against a party, who
fails to produce written evidence, when he can do so, is not

substantive proof. The mere non-production of written evidence, which is in the power of a party, generally operates as a strong presumption against him; but it has been sometimes carried too far by being allowed to supersede the necessity of other evidence, instead of being regarded as merely a matter of inference in weighing the effect of evidence in its nature applicable to, the subject of dispute. ( Wharton's Law of Ev. Vol 2 §1267 ; *Scoville* v. *Baldwin*, 27 Conn. 316.)

It may be regarded as satisfactorily proven, that for a considerable time after the alleged sale by him to Bindley on the 19th of March, 1883, there was no actual delivery, and Park remained in control of this lumber without any apparent change in the ownership. Now there is probably scarcely a single subject to be proved, where there has been a greater diversity of opinion, than that which has arisen as to what should be regarded as the legal effect, where there is an absolute sale of goods, and the possession remains with the vendor, so that he continues apparently the owner of the goods still. How an absolute sale of chattels, where there is no delivery of possession to the purchaser, should be regarded, whether as absolutely void as to creditors and *bona fide* purchasers as a fraud *per se*, or as such fraud *per se* with such exceptions only, as the courts as a matter of law shall decide, or whether such sales as to such parties are to be regarded as only *prima facie* fraudulent in fact, and as a matter of fact the jury is to determine in each particular case under the instructions of the court, whether such *prima facie* presumption of fraud in fact has been rebutted by the evidence introduced by the purchaser as to the fairness of the sale as well as of the retention of the possession by the seller, has given rise to greater diversity of opinion and more discussion than any other legal question.

The States in which it is held, that such absolute sale without delivery of possession is as to such persons fraudulent in law or, as the phrase is, a fraud *per se*, or that it is a fraud *per se* with such exceptions, as the courts shall decide as a matter of law render it not fraudulent, are Alabama, Connecticut, Delaware, Florida, Kentucky, Illinois, Indiana, Maryland, New Hampshire, New Jersey, Pennsylvania,

South Carolina and Vermont.    In these States the courts
have followed the decisions of the Supreme Court of the
United States, which has also as a matter of course been
followed generally by the various federal courts.    In these
States their decisions in some instances have been influenced
by statute-law.    And there has been, when exceptions have
been allowed by the courts to the holding of such sales as to
such persons fraud *per se*, much diversity of opinion as to
what these exceptions should be.    The following cases deci-
ded in these courts will illustrate the diversity of views and
show, that in these States these general principles are fol-
lowed : *Planters and Merchants Bank of Mobile* v. *Borland*, 5
Ala. 631; *Upton* v. *Raiford*, 29 Ala. 195 *sed vide. Hobbs* v.
*Bibb*, 2 Stewart 54; *Patton* v. *Smith*, 5 Conn. 196; *Osborn* v.
*Fuller et al.*, 14 Conn. 530; ——*Bowman* v. *Hening*, 4 Har-
ring 458; *Bellamy* v. *Bellamy*, 4 Florida 241; *Hundley* v. *Webb*,
3 J. J. Marsh. 643; *Dunie &c.*, v. *Morrison's Ex'or. &c.*, 6 Dana
182; *Woodrow* v. *Davis et al.*, 2 B. Mouroe 298; *Thornton* v.
*Davenport et al.*, 1 Scammon 296; *Rhines* v. *Phelps*, 3 Gilman
464; *Jourdan* v. *Turner*, 3 Blackford 309 ; *Hudson* v. *Warner's
Executors*, 2 Warriss and Gill 416; *Coleman* v. *Pickering*, 3
N. H. 415; *Page* v. *Carpenter*, 10 N. H. 77; *Chunar* v.
*Wood*, 1 Halstead 155; *Shannon* v. *Humphreys*, 2 Green 217;
*Clow* v. *Wood*, 5 Serg. & R. 275, *Myine* v. *Henry*, 40 Pa.
St. 358; *Smith* v. *Henry*, 1 Hill 16; *Reeves* v. *Harris*, 1
Bailey 568; *Weeks* v. *Weeks*, 2 Aiken 64; *Rockwood* v.
*Collamer et al.*, 14 Vt. 141.

The decision of the Supreme Court of the United States
which was followed in these States was *Hamilton* v. *Russell*,
1 Cranch 310 ; and it followed *Edwards* v. *Harben*, 2 T. R.
587.    But the principles laid down in this last case have been
since abandoned by the English decisions; and the principle
now followed by the English courts is, that absolute sales of
chattels, when the possession is not delivered to the pur-
chaser, as against creditors and *bona fide* purchasers are *prima
facie* fraudulent in fact, but this *prima facie* presumption of
fraud may be rebutted by proof; and that in each particu-
lar case the jury under the instructions of the court and not
the court is to decide, whether or not such sale is fraudulent,
it being a question of fact and not of law simply.    (*Martin-*

*dale* v. *Booth*, 3 B. & Ad. 498 ; *Carr* v, *Burdiss*, 5 Tyrwh. 316; *Dewry* v. *Baytum*, 6 East 257 ; *Reed* v. *Blades*, 5 Taunt. 212 ; *Lindon* v. *Sharp*, 6 Man. & Gr. 398; *Pennell* v. *Dawson*, 18 C. B. 355). These cases hold, that the question in such a case of fraud or no fraud is a question for the jury. And the spirit of these decisions is now followed in many States of this Union; and the number of the States, in which the courts are adopting them and abandoning the law as laid down on this subject by the Supreme Court of the United States is constantly increasing. The States, in which these views have been to a greater or less extent adopted, though in several of them different views on this subject were entertained, are as follows : Arkansas, Georgia, Maine, Massachusetts, Missouri, Michigan, New York, North Carolina, Ohio, Tennessee, Texas, Virginia. In some of these States their decisions have been influenced by statute-law.

The progress of the legal opinion of this country is towards. the position of the modern English courts, and the disposition, to depart from the law as laid down by the Supreme Court on account of the difficulty of applying it because of the many exceptions, which the courts have had to make to the general rule, that such a sale as to such persons is to be regarded as fraudulent in law, a fraud *per se*, are shown in the cases below, which have repudiated the decisions of the United States Supreme Court as to fraud *per se* and adopted to a greater or less extent the modern English law, that in such a case the question of fraud or no fraud is a question for the jury: *Hemstead* v. *Johnson*, 18 Ark. 184; *Peck* v. *Land*, 2 Kelly 1 ; *Fleming* v. *Townsend*, 6 Ga. 104; *Beers and others* v. *Dawson*, *Id.* 557 ; *Ulmer* v. *Mills*, 8 Greenleaf 312 ; *Clark* v. *French*, 23 Maine 221; *Brooks* v. *Powers*, 15 Mass. 244; *Holmes* v. *Crane*, 2 Pick 607; *Olliver* v. *Eston*, 3 Mich. 114 ; *Shepherd* v. *Trigg*, 7 Mo. 416 ; *Milburn* v. *Waugh*, *Corthorn and others*, 11 Mo. 369; *Kuykendall* v. *McDonald*, 15 Mo. 416; *Rea* v. *Alexander*, 5 Ired. 644; *Stoddart* v. *Butler*, 20 Wend., 507; *Smith & Hoe* v. *Archer*, 23 Wend. 563 ; *Handsford* v. *Archer*, 1 Hill N. Y. 273 ; *Bishop* v. *Cork*, 13 Barb. 429, *sed vide Sturtevant & Keep* v. *Ballard*, 9 Johns. 327; *Jennings* v. *Carter & Wilcox*, 2 Wend. 446 ; *Rogers* v. *Dare and others*,

Wright 136; *Collins & McElery* v. *Myers et al.*, 16 Ohio 547; *Callen* v. *Thompson*, 3 Yerg. 475; *Maney* v. *Killough*, 7 Yerg. 440; *Wiley* v. *Laslee*, 8 Humphries 717; *sed .vide Ragan* v. *Kennedy*, 1 Overt. 21; *Bryant* v. *Kelton & Wyzel*, 1 Tex. 415; *Gibson* v. *Hill*, 21 Tex. 228; *Davis* v. *Turner*, 4 Gratt. 422; *Forkner* v. *Stuart*, 6 Gratt. 197; *sed vide Alexander* v. *Deneale*, 3 Munf. 341; *Williamson* v. *Farley*, Gilm. (Va.) 15; *Sydnor* v. *Gee*, 4 Leigh 535.

In the case of *Davis* v. *Turner*, 4 Gratt. 422, the Court of Appeals of Virginia went into a most laborious and careful examination of the question, we are now considering, and in this opinion they reversed all the preceding Virginia cases, several of which, which appear to have laid down the law as laid down by the Supreme Court, which they disapproved. The syllabus of the case is : "The doctrine of fraud *per se* examined and repudiated. The retaining possession of personal property by the vendor after an absolute sale is *prima facie* fraudulent; but the presumption may be rebutted by proof."

Where the court here say, the doctrine of fraud *per se* is repudiated, I understand them to mean in case of an absolute sale of personal property, where the seller retained possession of it, such sale as.to the creditors of the seller is not void in law as necessarily fraudulent, but it is a question of fact, whether it be fraudulent, and the *prima facie* presumption, that such sale is fraudulent, may on the trial of the case before a jury be rebutted by. proof. This was what was really decided in that case; and so understood I approve it as in accord with sound reasoning and with the weight of authority. But even if I thought otherwise, I should feel bound by this decision as settling this much disputed question after a most careful examination of it, the discussion of it in that case occupying nearly fifty pages of the volume of reports. And so far as I am aware this case has always been regarded by the bar as finally settling this much mooted question both in Virginia and in this State, whether in such case the court or jury should decide as to the fraudulency of such a sale. Its authority has never since been questioned either in this State or in Virginia. It was followed and its binding authority recognized in *Forkner* v. *Stuart, &c.* 6 Gratt. 197, and in *Curd* v. *Miller's ex'ors*, 7 Gratt. 185.

In the first of these cases the Court of Appeals declared, that the proper instruction to be given to the jury in such a case was, that if it appeared to them, that an absolute sale had been made, but that the possession did not accompany such sale but remained with the seller, "then that such retention by the vendor was *prima facie* evidence of fraud but not conclusive and was liable to be repelled by satisfactory legal evidence of the fairness and good faith of the transaction." In the case last cited in 7 Gratt. 185 it was decided: "Such continued possession raises the *legal* presumption, that the sale was fraudulent, which presumption throws imperatively upon the appellee the whole burden of proving the fairness and good faith of the transaction, and that can not be done without sufficient evidence, that the pretended sale was for a fair and valuable consideration; and in the absence of such evidence the *prima facie* presumption becomes absolutely and irresistibly conclusive."

I understand from these three cases in Grattan above referred to, that the retention of possession of personal property by the seller after an absolute sale raises a strong presumption of fraud as against the creditors of the seller, as it indicates, that the sale is a sham, or that the seller after the sale was to retain some interest in the property, and if the sale was a mere sham or was for an inadequate consideration, or if the seller retained an interest in the property after the sale, it would in either of the secases be a fraudulent sale and void as to the creditors of the seller; and therefore, if the seller remains in the possession of the personal property after its absolute sale, he must prove to the satisfaction of the jury, that the pretended sale was for a fair and valuable consideration, and that the seller did not retain an interest in the property after the sale, and unless this be proven, the *legal* presumption, that the sale was fraudulent can not be repelled, for this presumption throws imperatively upon the purchaser the burden of proving the fairness and good faith of the entire transaction. The jury may therefore be properly instructed by the court as to the strength and nature of the presumption, which the law attaches to the fact, that the seller remains in possession of personal property after an absolute sale. They may also be properly directed to attach to it such

weight, as the law attaches to it, though this may be perhaps more weight, than they would naturally attach to such a circumstance; and if, whether they be instructed by the court or not, their verdict is in favor of the fairness of such sale, if it distinctly appears, that the purchaser remained in possession of the personal property after the absolute sale, then the verdict should be set aside, if it does not appear, that there was sufficient evidence for the jury to infer from it, that the price paid for such property was a fair price, and that the keeping possession of such personal property was not to enable the seller after the sale to enjoy an interest in it, which he had retained, and that the entire transaction was fair. But in determining, whether the evidence before the jury was sufficient to justify them in drawing such an inference, the court should not weigh such evidence very nicely, as though the duty was imposed on them of determining, whether there was or was not fraud in the sale, but should assume, that the jury had drawn the proper inferences from the facts proven, unless such inferences be drawn from clearly insufficient evidence or in the absence of any facts proven to sustain some of them, which would indicate, that the jury did not understand the extent, to which under such circumstances the law imposed the burden of proof on the purchaser.

Thus the rule, which should govern the courts in awarding a new trial in cases of this character, is somewhat different from the rule, which usually governs the court in awarding new trials. This is a consequence of the presumption of fraud, which in this State and in Virginia is attached to the seller of personal property, who retains possession of it after a sale, being a *legal* presumption and as such having greater weight than the natural presumption, which a jury would give to such retention of possession by the seller, though such a presumption is in no case conclusive; and they are therefore peculiarly liable to err by not giving such retention of possession by the seller the full weight as a *prima facie* presumption of fraud, to which it is legally entitled. The Court should therefore see, that the jury's verdict has not been based on this natural misunderstanding of the law. But if the court can see, that giving to the retention of the pos-

session by the seller all the weight, which the law attaches to it as raising a *prima facie* presumption of fraud, there is sufficient evidence in the case to justify the jury in the conclusion, that sufficient facts have been proven to overthrow this artificial weight attached to this presumption of fraud, the court ought not to disturb the verdict of the jury, though the court would not have drawn the inferences of fact from the evidence, which it would appear they had drawn; for the jury and not the court are to ascertain and determine the facts in the case. The duty specially imposed on the court in cases of this description is simply to be satisfied, that the jury understood and acted upon the law properly in giving to the legal presumption of fraud because of the retention of the property by the seller the weight, which our law attaches to such presumption. If the jury do this, the court should not set aside a verdict in a case of this character, except where the circumstances are such, that it ought to set aside a verdict in any other case under like circumstances. There can be no question of the right of the court to grant a new trial, when the jury find a sale of personal property is not fraudulent as to creditors of the seller. The question of fraud or no fraud must be left to the jury; but the finding is not conclusive; and if their verdict is contrary to the law or to the evidence, it should be set aside. (*Forkner* v. *Stuart*, 6 Gratt. 197; *Vance* v. *Phillips*, 6 Hill N. Y. 433).

Though we have endeavored to state, in which of the States of the Union the courts hold, that the retention of the possession of personal property with certain exceptions laid down by the courts is conclusively fraudulent as to creditors, and such fraud can not be rebutted by proof of the falseness of the whole transaction, and in which of the States of the Union this is held not to be a true exposition of the law, and that in such case the question should be submitted to the jury as a question of fact; yet it should be understood, that it is difficult to classify the States in this manner. There are some States, in which the decisions are to a considerable extent different from most of the other States, in which they are above classed. Thus for instance many of the decisions in New Hampshire seem to be based on a different principle from those of most of the States, with which it is classed above.

This principle is thus expressed by Richardson judge in *Coburn* v. *Pickering*, 3 N. H. 415. He says:

"It is settled as firmly, as any legal principle can be settled, that the fraud, which renders void the contract in these cases, is a secret trust accompanying the sale, and that in the case of absolute sales, possession and use by the vendor, after the sale, is always *prima facie*, and if unexplained conclusive evidence of secret trust. It is therefore very clear, that fraud is sometimes a question of fact and sometimes a question of law. When the question is, was there a secret trust? it is a question of fact; but when the fact of a secret trust is admitted, or in any way established, the fraud is an inference of law which the the court is bound to pronounce."

In the South Carolina decisions a similar view can be sometimes noticed. The numerous Virginia decisions above cited seem therefore in principle to accord more nearly perhaps with the New Hampshire and South Carolina decisions than with the decisions of some other States, with which we have classified Virginia, as for instance, Massachusetts and Maine, where it would appear, that the practice is to let the non-delivery of possession by the seller, where an absolute sale is made, go to the jury for whatever it may appear to them to be worth. This is essentially different from the practice in Virginia to be deduced from the cases in 4th, 6th and 7th Gratt. Perhaps it may be misleading to classify, as I have done above, Massachusetts and Virginia together, or to classify, as we have done, Pennsylvania and New Hampshire together. But I thought despite these defects of such classification, perhaps a better idea could be obtained by dividing all the States into two classes, as I have done, arranging each State under one or the other of these classes according as its decisions generally accorded most with one or the other, than to render a confused subject perhaps still more confused by multiplying the classes, in which to arrange the decisions of the different States. It would be an utterly hopeless effort in this opinion to give any clear and definite idea of the different varieties of views on this subject entertained in the different States of the Union, as shown by their decisions. All that can be done is to give a general view of them; and more than this I deem unnecessary, as the cases

from Grattan's reports, to which I have referred, which are binding authority upon us, render it no longer necessary or even proper for us to resort to the decisions of courts in other States, at least so far as the question we are considering is covered by the principles laid down in the Virginia decisions which I have cited. The principles deduced from these decisions above announced will suffice to enable us to decide this case.

The only question remaining to be decided is : Did the circuit court on the evidence certified by the judge err in refusing to set aside the verdict of the jury, which in effect found, that this absolute sale of March 19, 1883, by Park to Bindley was not fraudulent and void as to Park's creditors ? The evidence certified clearly proves, that the seller Park remained in possession of the lumber sold on March 19, 1883, for two or three weeks thereafter, till it was attached and levied upon by certain of his creditors. This, we have seen, raised the *legal* presumption, that the sale was fraudulent as to the creditor's of Park. (*Curd* v. *Miller's Executors*, 7 Gratt. 185); and this presumption according to this authority threw imperatively on Bindley, the purchaser, the whole burden of proving the fairness and good faith of the transaction, and this burden he did not meet, unless there is sufficient evidence in the case to show, that the sale was for a fair and valuable consideration. As we have stated above, there must also be in the case sufficient evidence to show, that there was no secret trust in this sale, whereby Park was to continue to have an interest in the lumber after the sale, as his continuing in the possession and apparent ownership of it raised a strong *prima facie* presumption, that there was such a secret trust, and that Park continued to have an interest in the lumber after its sale.

Was there sufficient evidence before the jury to show that this sale was for a fair and valuable consideration? Park in his deposition gives a detailed list of the lumber sold to Bindley on March 19, 1883, and the price per thousand feet, at which the lumber of each kind was sold; and he deposes, that the prices, he sold it at, were its fair market value and all, that he could get for it after trying to sell it for some time. Bindley in his evidence corroborates Park's evidence

with reference to the prices to be paid by him for the lumber. There was not a particle of evidence introduced to show, that this sale was not made for a fair consideration.    If the jury believed this evidence of Park and Bindley, they could not but find, that this sale was for a fair and valuable consideration; and the burden imposed on Bindley, so far as this goes, was fully met.

But there was imposed on Bindley, as we have seen, in this case the further burden of showing, that Park had no interest in this lumber after the 19th of March, 1883, when he sold it to Bindley. Was this burden met?   Park and Bindley in their depositions both testify, that as Bindley lived and did business in Pittsburg, Pennsylvania, and could not attend to the shipping of this lumber, he bought of Park on March 19, 1883, from Wood county, where it was, to Pittsburg, he, when he bought the lumber, required Park to attend to its shipment, and he agreed to do so, Bindley to pay his expenses while superintending the transportation and shipping of the lumber and also the expenses of the hands, whom Park should hire to aid in shipping the lumber, and the cost also of its transportation.   This agreement was carried out; Park took control of the lumber, and while he was attending to its shipment as agreed, it was attached by some creditor or creditors of Park probably two or three weeks after the sale.   This is the explanation given by both Park and Bindley in their depositions of the fact, that Park after the sale remained in the control of the lumber as its apparent owner.   If true, this rebuts the *prima facie* presumption, which the law raises, that his continued possession of the lumber after the sale was a fraud as against his creditors, because it is to be presumed, that it was understood, he was to continue to have an interest of some kind in the lumber after its sale.   If the depositions of Park and Bindley can be relied upon, then Park had no interest in the lumber after the sale to Bindley on March 19, 1883, and he exercised control over it and was apparently the owner of it still, only because he had according to his agreement continued in the temporary possession as Bindley's agent, while superintending at Bindley's expense the shipment of the lumber to Pittsburg, where Bindley wanted it in his trade.   The

lumber belonged to Bindley, as by the contract it was according to the testimony of both these parties to be Bindley's from the time of the sale; and Park was to have the charge and the possession of it, while it was at Park's mill in Wood county, W. Va. If these statements be true, then the presumption, that Park had any interest in this lumber after March 19, 1883, it seems to me, is fairly rebutted.

But it is insisted, that, though this evidence might be sufficient to rebut the strong legal presumption of fraud raised by the fact, that the seller after March 19, 1883, remained in possession of the lumber and acted as its apparent owner hiring hands to aid in its shipment, yet the evidence disproves these statements of the seller and purchaser of the lumber. The principal evidence relied on by the defendants below, Martin Bros., to disprove these statements and to show, that Park after this sale on March 19, 1883, continued to have an interest in this lumber is that of E. A. Sherwood. He testified, that Park was at the mill after March 19, 1883, and ran it as before and sold various lots of lumber after that to other persons; that Park shipped no lumber after March 19, 1883, except a barge load on which he (Sherwood) levied an attachment, which he afterwards released. He was the sawyer of Park. Now it does not seem to me, that this statement is necessarily in conflict with the inference, which could be and doubtless was drawn by the jury from the depositions of Park and Bindley, that after the sale March 19, 1883, Park had no interest in any of the lumber, which he had sold to Bindley. Their evidence shows, that the lumber he sold Bindley was all planks, boards and trees already sawed up into lumber at the time of the sale. Bindley had in his business no use for trees not sawed up but only for lumber already sawed. There was according to their statements a sale of only this sort of lumber, and they say nothing about any agreement of Park to saw up any more trees into lumber for Bindley. It was therefore entirely consistant with their contract, that Park should saw up after March 19, 1883, any trees or logs, which he had at his mill then, and sell the lumber made from those logs to other persons; for they were and continued to be his own logs, and there is nothing in the evidence of Sher-

wood to show, that the various lots of lumber, he sold after that to other persons, was not the lumber arising from this sawing done after March 19, 1883. Nor is there anything to show either the size of these lots of lumber or the persons, to whom they were sold. The jury had a right to infer, that it was not the sawed lumber on hand on March 19, 1883, or any part of it, which was sold by Park.

The evidence of Bennington, that, when he chanced to be at the mill after March 19, 1883, "he saw Park acting as usual and conducting the business as he had before," proves nothing, which indicates, that Park had any interest in this lumber sawed prior to March 19, 1883. It is doubtless true, that Park was then attending to the sawing of logs, which he had on hand, and to the transhipment of the plank, which he had sawed prior to March 19, 1883, all of which, Park says, belonged to Bindley, to the shipping of which he had agreed to attend; his superintending the shipping was in accord with the terms of the sale of this plank, which he had made, and in no way shows, that he had any interest in the plank sawed prior to March 19, 1883. There is nothing else to indicate that Park had an interest in this lumber, which had been sawed prior to March 19, 1883, except the evidence of Sherwood, that Park never told him, till an attachment was levied on this lumber, that he had sold it on March 19, 1883, to Bindley. It does not strike me that this was very strange. Park owed Sherwood as his sawyer, and when he undertook to ship as Bindley's agent a barge of this lumber, it was at once attached by Sherwood. Had Park stated to him, that he had sold to Bindley all his lumber, it would doubtless have resulted in his at once attaching it; and Park can not be blamed for not volunteering information to Sherwood, which might lead to this result. Sherwood says, that, as far as he knows, this lumber at the mill, which had been sawed prior to March 19, 1883, and which was then there, had not been measured, and if it had been measured, he thinks he would have known it. This witness says noth- to show, that this lumber might not have been measured without his knowledge. He simply says, he thinks he would have known it, if it had been measured. If we are to understand the depositions of Bindley and Park, as, I suppose

they should be understood, that when this lumber was sold, Park furnished to Bindley a list showing the exact quantity by measurement, the jury would have had to disbelieve this statement of Bindley and Park or to have supposed, that this lumber had been measured without the knowledge of Sherwood, and if they believed this rather than disbelieve the sworn statements of Bindley and Park, we can not say, that they acted unreasonably.

The only other evidence in conflict with the testimony of the witnesses is that of John Murphy, an employe of the Baltimore and Ohio Railroad Company, whose duty it was to receive and inspect this lumber. He testifies, that "the lumber was returned to the company in the name of Park individually not as agent." The lumber he refers to is some lumber, which, he says, "he gave an order for to George Park some time in 1882 or 1883." Of this transaction Park in his deposition says: "In the fall of 1882 I accepted an order for oak lumber for the Baltimore and Ohio Railroad to be delivered at Parkersburg. I delivered a part of the order and collected the money for the part delivered. When I sold all my lumber to Albion Bindley of Pittsburg, Pennsylvania, on March 19, 1883, he agreed to carry out and complete this contract with the railroad company; and as agent for Albion Bindley I superintended the shipment of the lumber to the Baltimore and Ohio Railroad Company at Parkersburg. It was all taken from lumber on hand sold to Bindley. I rendered a bill for it to them in Bindley's name, and they insisted on its being billed by me as agent for Mr. Bindley, which I did."

Bindley testifies :

"It was all shipped afterwards by me as follows :

1883.

| April 2—2,506 | 8-12 ft. white oak @ $18.00 per M ...... ...... | $45 12 |
| 2—4,311 | 5-12 " " " " 16.00 " " ...........:. | 68 98 |
| 4—1,839 | 2-12 " " " " 18.00 " " ...... .... | 33 11 |
| 2,753 | 8-12 " " " " 16.00 " " ...... . .... | 47 26 |
| 3,596 | 2-12 " " " " 16.00 " " .. ...... ... | 57 34 |
| 1,433 | 9-12 " " " " 18.00 " " ...... .. | 25 81 |
| 3,065 | 11-12 " " " " 16.00 " " ........... | 49 05 |
| 1,224 | " " " " 18.00 " " ...... ...... | 22 03 |

$348 70

He further says " I presented a bill for it first in my own name and afterwards at their request in the name of George Park, agent for me, amounting to $348.70. This is the money attached by Martin Bros."

Now it seems to me, that, if these statements of the name, in which this lumber was shipped, and the name of the person, in whose name the bill for it was presented to the proper agent of the Baltimore and Ohio Railroad Company, were untrue, it was perfectly easy for the defendants to disprove them by the production of the bill, which had been presented to the company for this lumber, and that such proof would have been far more satisfactory than this statement of this inspector of lumber, that "this lumber was returned to the company in the name of Park individually and not as agent." It is quite probable, that this inspector would assume, that it was Park's lumber, as it was delivered to fulfil a contract with Park; and I do not suppose, that there was any necessity to explain to him, that it was Bindley's lumber, and that he was filling Park's contract. Park and Bindley both say, that the bill was first rendered to the proper officer of the company in Bindley's name, and afterwards it was changed to Park's, as agent of Bindley, at his instance, I suppose to show, that it was the balance on the contract with Park. He was the proper person to contradict the statement of Park and Bindley in their depositions; and, if what they stated was untrue, he could have effectively contradicted them by the production of the bill for the lumber actually presented to the company, which he kept doubtless. The principle, which we have laid down, seems to me, to apply in this case, that "the holding back of evidence may be used as a presumption against the party, who holds back such evidence, in all cases, in which it could be produced." It seems to me the jury had a right to believe under these circumstances, that the statements in the depositions of Park and Bindley, in reference to the name, in which this lumber was after March 19, 1883, delivered to the Baltimore and Ohio Railroad Company were true; and that the burden imposed on Bindley, the plaintiff, of proving, that Park after March 19, 1883, had no interest in this lumber sawed prior to that date and then on hand and sold to Bindley, was fairly met. It

seems too, that the plaintiff below did affirmatively prove the fairness and good faith of the whole transaction, if their evidence is to be regarded as true. Park for instance says, that on March 19, 1883, no suits were either pending or threatened against him anywhere, and he had enough property to pay every thing in the world he owed and have a considerable sum left, and he had made contracts to sell his land and lumber to pay all his debts. He says, too, he has not received a cent from Bindley for the sale of this lumber and does not expect to, till all the orders, which he had agreed to accept to pay his various debts, are paid. And Bindley says he agreed to accept orders in favor of certain of Park's creditors, and he did so, and among them is an order in full of the debt of Martin Bros., and that he had applied all the money, that had come due to Park, accordingly and had paid to him nothing individually.

If we consider, that the jury fully understood the weight of the presumption against the plaintiff below, the purchaser of the lumber, which resulted from his leaving the lumber in the hands of the seller, Park, yet the evidence in this case was sufficient to warrant the finding by the jury, that this strong *prima facie* presumption of fraud was rebutted; and we can not award a new trial because of such finding, unless the evidence is plainly insufficient to overthrow the strong presumption of fraud raised by the admitted fact, that the possession of this lumber remained with the seller after an absolute sale of it to the plaintiff below. (*Grayson's Case*, 6 Gratt 724). We do not think that this evidence was plainly insufficient to produce this result; on the contrary, if the evidence of Park and Bindley was credited by the jury, their evidence, as we have seen, warranted the verdict, which the jury rendered despite all the evidence of the witnesses of the defendants below.

The court below therefore did not err in refusing to grant a new trial in this case; and the judgment of December 18, 1884, rendered on this verdict must be affirmed, and the defendant in error Albion Bindley must recover of the plaintiff's in error Harrison Martin, David Martin and Blackburn Martin, partners trading as Martin Bros., his costs in this Court expended and 30.00 damages.

AFFIRMED.